# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| TRAQUISE MANNING, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 13 C 2214 |
| v. ) | |
| ) | Judge Sara L. Ellis |
| CITY OF BLUE ISLAND and BLUE ISLAND ) | |
| POLICE OFFICER CARLOS ORTEGA, ) | |
| Star #160, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Traquise Manning, after being acquitted of attempted armed robbery, sued Defendant Officer Carlos Ortega for the alleged suppression of exculpatory evidence and for false arrest stemming from a show-up identification during the investigation of the armed robbery, pursuant to 42 U.S.C. §1983. Additionally, Manning brought a claim for malicious prosecution against Ortega and Defendant City of Blue Island ("City") and for indemnification under 745 Ill. Comp. Stat. 10/9-102 against the City. Defendants moved for summary judgment on all claims [65]. Because Ortega is entitled to qualified immunity, and Count II is barred by the statute of limitations, summary judgment is entered for Defendants on Manning's due process (Count I) and false arrest (Count II) claims. Because Ortega is not liable on these counts, judgment is entered for the City on Manning's claim for indemnification (Count III). Finally, because there are no facts to create a triable issue on Manning's malicious prosecution claim, summary judgment is entered for Defendants on Count IV. The Court, therefore, grants Defendants' motion in its entirety and this case is terminated.

# BACKGROUND[1]

On May 12, 2010, Officer Ortega, a City police officer, responded to the scene of an attempted armed robbery at 2525 West Cochran Street in Blue Island, Illinois. When Ortega arrived, he interviewed the victim, Victor Ramos, about the crime. Ramos recounted that, at approximately 9:20 p.m., he was on his property outside his home when three men with handguns approached him and ordered him to stop and shut up. Ramos retreated from the men toward his home. One of the three pointed his gun at Ramos and one of the men instructed the others to hit Ramos. Ramos yelled for help and the men ran away. Ramos described the men who attempted to rob him as three African-American males, approximately 5'7" to 6'0" in height, wearing black hoodies and blue jeans. Ramos told Ortega that the three men had handguns.

Ortega arrived at Ramos' home to interview him less than five minutes after Ramos had called for help during the robbery. Ortega broadcast Ramos' description of his assailants over the police radio and then received a call from other police officers that they had detained two possible suspects matching that description. Ortega told the other officers he would bring Ramos to the location of the suspects for a show-up. Ortega took Ramos by car to the location of the first suspect, 2540 Lewis Street, which was about one block from Ramos' residence and less than one minute's travel time. Manning was the suspect stopped at 2540 Lewis Street. Ortega parked the police car across the street from Manning, so that there were no obstructions in Ramos' line of sight. Manning was wearing blue jeans and a black hoodie with the hood off. At the time Ortega observed Manning from the police car, Manning was not wearing handcuffs. There were twenty to fifty feet between the parked car and Manning. Detectives were standing with

---

[1] The facts in this section are derived from the Parties' Joint Statement of Undisputed Material Facts [67]. All facts are taken in the light most favorable to Manning, the non-movant.

Manning on the street and those detectives positioned Manning so that Ramos had a frontal view of him. Manning was under street lights, and Ortega's headlights and spotlight were pointed at him. Manning was instructed to look into the spotlight, which he did. When Ortega asked Ramos if he recognized anyone standing with the detectives in front of them, Ramos responded affirmatively and positively identified Manning as one of the men involved in the attempted armed robbery. Ortega then asked Ramos if he was sure of the positive identification and Ramos repeated his positive identification of Manning.

Manning was charged with one count of attempted robbery and acquitted after a bench trial. This lawsuit followed.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56 & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598-99 (7th Cir. 2000). Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's

3

favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## ANALYSIS

I.  **Count I (*Brady* Violation)**

Defendants move for summary judgment on Count I on the basis of qualified immunity, arguing that Manning cannot establish any constitutional violation because he has not shown that Ortega suppressed evidence and, even if such suppression was proven, he has not produced facts to demonstrate materiality.  Manning argues in response that Ortega committed a due process violation under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), by suppressing the information that (1) Mr. Ramos never saw the third offender; (2) Mr. Ramos' identification was caused by Defendants' suggestion; and (3) Manning was negatively identified in a related line up.   Because Manning has not demonstrated that Ortega suppressed any evidence, there is no constitutional violation and Ortega is entitled to qualified immunity.

Qualified immunity protects a police officer from civil liability so long as his or her conduct does not violate a clearly established statutory or constitutional right about which a reasonable officer would have known.  *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).  In deciding whether qualified immunity applies, the Court examines whether the facts shown "make out a violation of a constitutional right" and whether that right was "clearly established" at the time of the officer's actions.  *Id.* at 232 (quoting *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2009)), *id.* at 236 (making the order of inquiry discretionary).  A right is clearly established when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Jacobs v. City of Chicago*, 215 F.3d 758, 766 (7th Cir. 2000) (citation omitted).

Although qualified immunity is a defense, Manning bears the burden of proof to show a constitutional violation and that the right was clearly established. *See Eversole v. Steele*, 59 F.3d 710, 717 (7th Cir. 1995). If a reasonable officer could have believed the action taken was lawful, in light of clearly established law and the facts known to the officer at the time, qualified immunity applies. *Omdahl v. Lindholm*, 170 F.3d 730, 733 (7th Cir. 1999).

Under *Brady*, a police officer is obligated to turn over exculpatory or impeaching evidence to the prosecutor, who then has a duty to disclose that evidence to the defense. *Carvajal v. Dominguez*, 542 F.3d 561, 566 (7th Cir. 2008) (considering qualified immunity defense). To prove a *Brady* violation, Manning must prove: (1) that the evidence is favorable to him, either because it is exculpatory or impeaching; (2) the evidence was either willfully or inadvertently suppressed by the government; and (3) the evidence was material—i.e. there is a reasonable probability that the result of the trial would have been different. *Id.* at 566–67. Suppression of evidence results when (1) the prosecution fails "to disclose the evidence in time for the defendant to make use of it, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence." *Id.* at 567.

Manning argues that Ortega suppressed exculpatory evidence, specifically that: "1) Mr. Ramos never saw the third offender; 2) Mr. Ramos' identification was caused by the defendants' suggestion; and 3) Plaintiff was negatively identified in a related line up." Resp. at 3. With regard to the first issue, Manning contends that Ramos never saw the third offender during the robbery and that this detail was not included in Ortega's or Detective Sepessy's reports that were disclosed to Manning during discovery in his criminal case. Resp. at 4. However, Manning has not pointed to any facts to establish that Ramos told Ortega at the time of the identification that he never saw the third offender or that Ramos was identifying Manning specifically as the third

5

offender. Manning's support for this argument is the statement: "Mr. Ramos did not 'lay his eyes' on Offender #3." Doc. 67 ¶ 67. That Ramos "did not 'lay his eyes' on Offender #3" is a free-floating statement, without any anchor in time or indication that it was made to Ortega. The statement does nothing to connect "Offender #3" to Manning. And this statement does not support or create a material issue of fact that Ortega knew the identification was somehow suspect and then covered it up.

The record evidence basis for this statement is Ramos' deposition testimony ("Q: Okay. And what did you tell him they looked like? A: I told him that one was tall. The other one was shorter, and the third person I didn't lay my eyes on him, because the tall one and the other one were the ones doing the talking.") and Ramos' trial testimony ("Q: The guy next to him on the other side, he didn't – you didn't really get a good luck [*sic*] at him? A: No."). *See id.* (citing Ex. B at 28:14–19 & Ex. H at 45:21–24). However, these facts do not demonstrate that Ramos told Ortega at the time of the identification that he had not gotten a good look at Manning during the robbery because Manning was "Offender #3," but nevertheless was positively identifying Manning as Offender #3 during the show-up. Put another way, these facts do not prove that Ramos identified Manning as his assailant even though Ramos admitted to having not seen him, Ortega knew that fact, and more importantly, Ortega hid this information from Manning. At the most the deposition transcript excerpt supports the idea that Ortega knew at the time of the show-up that Ramos had gotten a look at two of the three robbers, the ones "doing the talking," and that Ramos described one as tall and the other as shorter. Manning has simply not met his burden on summary judgment to put forward affirmative facts to show that Ortega willfully and intentionally suppressed that Ramos' identification of Manning was unreliable because Manning was "Offender #3," whom Ramos did not "lay eyes on."

6

Second, Manning argues that the identification process was fundamentally flawed and Ortega did not disclose that Ramos' identification of Manning was the result of improper suggestion. Manning argues that Ortega knew Ramos was in shock, which affected what he saw, and so Ortega should have "give[n] a cautionary instruction" rather than pointing Manning out to Ramos during the show-up. Resp. at 4. Manning provides no support for the proposition that an officer's failure to issue a cautionary instruction to a crime victim who appears to be in shock renders a show-up identification constitutionally deficient. And a show-up identification, on its own, is not necessarily unduly suggestive and an automatic due process violation. *United States v. Hawkins*, 499 F.3d 703, 707 (7th Cir. 2007). For example, a show-up identification "is not unduly suggestive in cases of extraordinary urgency [and] [o]ne such extraordinary situation is confirming that an individual apprehended close in time and proximity to the scene of a crime is, in fact, the suspected perpetrator of the crime." *Id.* "Such identifications both protect innocent individuals from unnecessary arrest and help authorities determine whether they must continue to search for the actual perpetrator." *Id.* at 708. The Seventh Circuit has explained that the Supreme Court considers this "an appropriate method for law enforcement to employ in order to determine whether their investigation is on the right track." *Id.* (citing *Simmons v. United States*, 390 U.S. 377, 384–85, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968)). According to the Parties' Joint Statement, Ortega arrived at Ramos' house less than five minutes after the robbery. Ortega interviewed Ramos, and subsequently broadcast Ramos' description of the attackers over the police radio. Ortega then transported Ramos less than one minute's drive to the site of the show-up, which was one block away from the crime scene. This procedure aligns with the allowable extraordinary urgency show-up identification exception. *See id.* (show-up in the immediate

vicinity of and less than one hour after the robbery not unduly suggestive). There is no *per se* due process violation with this show-up.

Manning argues that Ortega told Ramos that the officers had caught one of the robbers and then pointed Manning out to Ramos during the show-up, making the identification unreliable, and that this should have been disclosed in Ortega's report. Manning relies on the following two statements of fact for this argument: "Officer Ortega told Mr. Ramos to 'get in, they already identified one,' and that he needed to identify someone," Doc. 67 ¶ 72, and "Immediately prior to the identification, Officer Ortega pointed Mr. Ramos to look at Mr. Manning," *id.* ¶ 90. Defendants counter that the Seventh Circuit considered and rejected an almost identical argument regarding alleged pressure to identify in *Holland v. City of Chicago*, 643 F.3d 248 (7th Cir. 2011). In *Holland*, the plaintiff also asserted a *Brady* claim based on alleged pressure by the police on a rape suspect to identify her attacker. 643 F.3d at 255–56. There, the plaintiff was shown to the victim three times, and each time the plaintiff heard the victim say that he was not her assailant. *Id.* The victim went on to identify the plaintiff as her attacker during the trial, where she attributed her initial negative identifications to fear. *Id.* The Seventh Circuit stated that this was not a *Brady* violation because there was no evidence the officers coerced the plaintiff into lying or withheld exculpatory evidence from the plaintiff, and the plaintiff should have, using reasonable diligence, asked the victim about the negative identifications that the plaintiff himself witnessed. *Id.* Further, the Court found the prior negative identifications were not material considering this was a bench trial with strong physical evidence. *Id. Holland* is a more extreme case than this one—here there are no repeated negative identifications later contradicted, rather one initial positive identification that led to the arrest—yet in *Holland* the Seventh Circuit found no *Brady* violation. Like *Holland,* there is no evidence

that Ortega coerced Ramos into lying about his identification of Manning and the fact that Ortega said "they already identified one" and pointed Manning out during the show-up do not render the identification unreliable and create a *Brady* issue.

Defendants further argue that, even if Ortega was found to have suppressed evidence of a faulty identification, to prove materiality for a *Brady* claim when the plaintiff, as here, was acquitted, Manning must show that "the decision to go to trial would have been altered by the desired disclosure." *See Bielanski v. County of Kane*, 550 F.3d 632, 644–45 (7th Cir. 2008) (quoting *Carvajal*, 542 F.3d at 569).[2] Manning argues that Ramos' identification was the only piece of evidence offered against him and therefore was material. However, Manning points to no evidence for this assertion and the Court can find none in the Parties' Statement. In addition, the desired disclosure is not the identification itself, but the alleged circumstances within Ortega's knowledge that made the identification unreliable, i.e. that Ortega pointed Manning out to Ramos and said the police "already identified one." As discussed above, those circumstances do not render the show-up identification unreliable. *See Hawkins*, 499 U.S. at 708 (finding "that the officers took no steps other than the showup itself to suggest that [plaintiff] was the robber"). Manning has not shown that this disclosure would have altered the State's decision to go to trial on Ramos' positive identification.

Defendants also argue that evidence that was otherwise available to Manning through the exercise of reasonable diligence cannot support a *Brady* violation and nothing impeded Manning or his attorney or investigator from interviewing Ramos to determine his ability to identify the perpetrators. *Carvajal*, 542 F.3d at 567. Manning does not take on this argument directly, but rather argues that this case is analogous to *Sellers v. Bragg*, No. 04 C 3663, 2005 WL 1667406

---

[2] The Seventh Circuit has expressed doubt "that an acquitted defendant can ever establish the requisite prejudice for a *Brady* violation" because "a true constitutional violation is measured with the outcome in mind." *See Carvajal*, 542 F.3d at 570.

9

(N.D. Ill. July 13, 2005). In *Sellers*, the district court found the plaintiff's allegations that two line-up identifications were coerced was sufficiently pleaded to establish the favorable evidence prong of *Brady* on a motion to dismiss. 2005 WL 1667406, at *4. Describing the usual procedures of a line-up, where the accused cannot see the identifier as he or she views the line-up participants and has no knowledge of the circumstances surrounding the line-up, the court found the plaintiff had reasonably pleaded suppression of exculpatory evidence. *Id.* at *5. *Sellers* is inapposite here. First, its procedural posture is a motion to dismiss, so the court was weighing pleading sufficiency versus a plaintiff's burden to present facts to counter summary judgment. *See id.* (noting, "Discovery will enable the parties to explore these issues. For now, however, the Court draws all reasonable inferences in favor of Plaintiff. And it is an inference within the realm of plausibility that exculpatory evidence was suppressed from Plaintiff."). Second, that the *Sellers* court described the typical line-up as something outside the accused's knowledge does not mean that there was exculpatory evidence surrounding the identification to which he did not have access. Manning argues that he was standing with the lights in his face and could not see what transpired between Ortega and Ramos in the car. However, has not pointed to any facts to support why his defense lawyer could not have discovered any alleged irregularities in the identification process through reasonable diligence, including by interviewing Ortega or Ramos about the show-up. *See Holland*, 643 F.3d at 256 ("A defendant in a criminal case that actually goes to trial has the responsibility to probe the witnesses and investigate their versions of the relevant events." (internal quotation marks omitted) (citation omitted)); *United States v. White*, 970 F.2d 328, 337 (7th Cir. 1992) ("While the Supreme Court in *Brady* held that the government may not properly conceal exculpatory evidence from a defendant, it does not place any burden upon the government to conduct a defendant's investigation or assist in the presentation of the

defense's case." (internal corrections omitted) (citation omitted)). Manning cannot satisfy this element of the *Brady* analysis on his claim that Ortega suppressed information that the investigation process was fundamentally flawed.

Finally, Manning argues that Ortega did not disclose that Manning was negatively identified in an additional line-up and that constitutes a *Brady* violation. On May 14, 2010, a victim from another crime viewed a line-up and negatively identified Manning as the perpetrator of that crime. Doc. 67 ¶ 75. Manning argues that the negative line-up identification from this victim of another robbery was not properly disclosed in Detective Sepessy's report and is proof of Manning's innocence of that crime and therefore was exculpatory evidence. Resp. at 4–5. As an initial matter, Manning has not pointed to any facts to show Ortega, the only individual officer sued in this case, knew about the second line-up or even about the contents of Detective Sepessy's report. Secondly, that another victim negatively identified Manning in connection with another crime is not exculpatory or impeaching evidence for the Ramos robbery. Other courts have refused to find *Brady* violations in similar circumstances. *See Harris v. Kuba*, 486 F.3d 1010, 1016 (7th Cir. 2007) (explaining, "[n]one of these pieces of evidence is exculpatory for Harris regarding the crime for which he was charged").[3]

Because Manning has not established a constitutional violation in relationship to the show-up identification, Ortega is entitled to qualified immunity and summary judgment is entered for Defendants on Count I.

---

[3] Manning asserts this case is analogous to *Sanders v. English*. However, there a § 1983 violation was found when the officer suppressed a negative identification by the victim of the crime charged. *See* 950 F.2d 1152, 1162 (5th Cir. 1992).

## II. Count II (False Arrest)

### A. Statute of Limitations

Defendants request summary judgment on Manning's § 1983 claim of false arrest against Ortega. Defendants argue that because there was probable cause for Manning's arrest, there is no constitutional violation and therefore Ortega is entitled to qualified immunity. Defendants argue alternatively that this claim is barred by the statute of limitations. Manning responds that the show-up identification was constitutionally deficient and Ortega's reliance on that identification was not reasonable under the circumstances and cannot establish probable cause. On the limitations issue, Manning argues that equitable tolling, equitable estoppel, and the discovery rule should apply to salvage this claim.

Manning's false arrest claim is time-barred. Because Section 1983 does not contain an express limitations period, federal courts use the forum state's statute of limitations for personal injury claims. *See Johnson v. Rivera*, 272 F.3d 519, 521 (7th Cir. 2001). That means in Illinois the statute of limitations for § 1983 claims is two years. *Id.*; 735 Ill. Comp. Stat. 5/13-202. The time limit to file Manning's claim began to run on the date of his arrest, May 12, 2010. *See Brooks v. City of Chicago*, 564 F.3d 830, 832 (7th Cir. 2009) ("A § 1983 claim seeking damages for false arrest in violation of the Fourth Amendment, where the arrest is followed by criminal proceedings, begins to run at the time the claimant becomes detained pursuant to legal process." (internal alterations omitted) (citation omitted)). Manning filed his initial complaint on March 22, 2013, almost one year too late.

Manning asks the Court to apply equitable tolling because Defendants actively misled Manning by withholding exculpatory and impeachment evidence, and therefore extraordinary circumstances prevented him from asserting his rights. Equitable tolling "permits a plaintiff to

avoid the bar of the statute of limitations if despite all due diligence he is unable to obtain vital information bearing on the existence of his claim." *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990). As discussed above, Manning has not shown that Ortega withheld exculpatory or impeachment evidence from him. In addition, Manning has made no showing that, despite his or his counsel's due diligence, he was unable to obtain information about the existence of his claim. Manning has provided no details of how, if at all, he or his counsel attempted to investigate this claim such that equitable tolling should apply.

Manning also requests that the Court apply equitable estoppel, arguing that Defendants purposefully withheld material, exculpatory information from him that prevented him from timely filing this action. Manning further argues that once he suspected this withholding, he diligently investigated and then filed suit. Defendants counter that because Ortega did not withhold any exculpatory information, this equitable doctrine does not apply. The Court agrees. Equitable estoppel suspends the running of the statute of limitations when a defendant takes active steps to prevent a plaintiff from timely filing suit, for example by destroying or tampering with evidence, or affirmatively abandoning a statute of limitations defense. *Cada*, 920 F.2d at 450–51. Again, Manning has not established that Ortega actively withheld exculpatory evidence about the show-up identification. Similarly, Manning does not pinpoint when exactly he learned of the alleged withholding of this information and presents no facts to support his argument that he diligently pursued the action once he did discover it. Equitable estoppel is only available under limited circumstances and is not warranted here. *See Smith v. City of Chicago Heights,* 951 F.2d 834, 840–41 (7th Cir. 1992).

In a final attempt to save this Count, Manning argues that, despite the Court's prior ruling, the discovery rule should apply to save this false arrest claim. This Court's February 5,

13

2014 Opinion and Order on Defendants' Motion to Dismiss [47] is the law of the case and Manning has presented no reason why the Court should revisit its findings. *See Avita v. Metro. Club of Chicago, Inc.*, 49 F.3d 1219, 1227 (7th Cir. 1995) ("The doctrine of law of the case establishes a presumption that a ruling made at one stage of a lawsuit will be adhered to through the suit."). Manning's false arrest claim is barred by the statute of limitations.

### B. Qualified Immunity

However, even if Count II were not barred by the statute of limitations, Ortega would be entitled to qualified immunity on this claim because he had probable cause to arrest Manning. "A police officer has probable cause to arrest an individual when the facts and circumstances that are known to him reasonably support a belief" that the individual has committed a crime. *See Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 679 (7th Cir. 2007). To evaluate probable cause, the Court makes an objective examination of the facts and determines what conclusions an arresting officer might have reasonably drawn from those facts. *Id.* Probable cause defeats a false arrest claim. *See id.* at 679–80 ("If the officer had probable cause to believe that the person he arrested was involved in criminal activity, then a Fourth Amendment claim for false arrest is foreclosed.").

The facts and circumstances of the identification of Manning by Ramos led Ortega to reasonably conclude that he had probable cause for the arrest. Ramos positively identified Manning during the show-up as one of the men involved in the robbery. When Ortega asked Ramos if he was sure about the identification, Ramos again positively identified Manning. Ramos observed at least two of the three robbers at close range, under the lights at his home, and similarly, during the show-up Ramos observed a well-lit Manning from an unobstructed, relatively close view. Ramos identified Manning within a few minutes of the crime and the

circumstances of the show-up were not unduly suggestive. Ramos was a credible witness and Ortega was entitled to rely on his identification to believe that Manning had participated in the crime. *See Mustafa v. City of Chicago*, 442 F.3d 544, 548 (7th Cir. 2006) ("[P]olice officers have no duty to investigate extenuating circumstances or search for exculpatory evidence once probable cause has been established via the accusation of a credible witness.").

Manning responds that the identification was not reliable and therefore cannot be the basis of a finding of probable cause. For this argument, Manning relies on the factors that a court uses to assess whether an identification is reliable starting from the foundation of an unduly suggestive identification procedure. *See Hawkins,* 499 F.3d at 710 (listing factors). Having determined that the show-up procedure involving Manning was not suggestive, however, this analysis is not applicable here. Even considering Manning's arguments, the Court still finds probable cause for Manning's arrest.

Manning first argues that Ramos did not have an opportunity to view the third offender. As discussed above, Manning bases his argument on Ramos' trial and deposition testimony which does not establish that Ortega knew at the time of the show-up that Ramos both did not have an opportunity to view the third offender and that Ramos was then identifying Manning as that third offender. Manning also contends that Ramos' deposition testimony demonstrates that he could not remember the circumstances of the show-up and that he was no longer positive in his identification of Manning. However, the existence of probable cause hinges on the information that was known to the officer at the time of the arrest, not information that is learned after the fact. *See Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999). Later testimony does not establish that Ortega knew that Ramos' identification was either mistaken or questionable at the time. Manning's reliance on *Johnson v. Franks* is misplaced because there the court found

15

the officers had information (about enmity between the parties and problems with the witnesses' stories) that directly called into question the reliability of their basis for probable cause. No. 08-4075, 2011 WL 841049, at *6 (C.D. Ill. Mar. 4, 2011). Manning has not shown Ortega had any such knowledge at the time of the show-up.

Similarly, Manning argues that Ramos could not provide a detailed physical description of his attackers, despite the bright lights of his backyard, because he was in shock and under stress and further that Manning's distinctive hairstyle suggests that Ramos misidentified him as one of the participants. Again, Manning does not argue or show that Ortega knew any of these factual discrepancies at the time. Finally, Manning contends that the lack of corroborating evidence and Manning's location at a half a block away from the robbery after five minutes had elapsed weigh in favor of his innocence. Although these factual details might (and apparently did) undercut the strength of the identification at trial, Ortega was entitled to rely on Ramos' positive identification of Manning for the arrest. An officer need not conduct detailed additional investigation or weigh the credibility of an eyewitness if that witness is believable. *Spiegel*, 196 F.3d at 723, 726. Manning has not put forward any facts to show that Ortega was confronted with, but closed his eyes to, any competing factual scenario, as was the case in *Payne v. Maher*. *See* No. 11 C 6623, 2014 WL 625480, at *3 (N.D. Ill. Feb. 18, 2014) (officer's failure to ask where alleged weapon was, thus leading to arrest of one rather than the other two individuals involved in an incident, undercut probable cause).

And even if Ortega incorrectly determined that probable cause existed to arrest Manning, he is still entitled to qualified immunity because he made a reasonable conclusion that there was probable cause to arrest. *See Spiegel*, 196 F.3d at 723 ("[Q]ualified immunity applies not only to those officials who correctly determine that probable cause to arrest exists, but also to those

16

governmental officials who reasonably but mistakenly conclude that it does."). Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986). Ortega reasonably relied on Ramos' positive identification of Manning and therefore is entitled to qualified immunity for the false arrest Count.

### III. Count III (Indemnification)

Manning seeks indemnification against the City, pursuant to 745 Ill. Comp. Stat. 10/9-102, in the event Ortega is found liable on either § 1983 count. Because the Court has found Ortega has qualified immunity for Counts I and II, Manning's claim for indemnification cannot stand. Summary judgment is entered for the City on Count III.

### IV. Malicious Prosecution

Manning also brings an Illinois state law claim for malicious prosecution against Ortega and the City. A malicious prosecution claim requires that Manning establish: "(1) the commencement or continuation of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Holland*, 643 F.3d at 254. Whether there was probable cause for the prosecution is determined as of when the charging document was filed, not at the time of the arrest. *Id.*

Manning argues that probable cause to charge him was lacking because Ortega knew that Ramos did not see the third offender and because Ramos was in shock and not able to properly identify anyone during the show-up. The Court rejects this challenge to probable cause for the reasons discussed above. Manning further argues that Defendants held Manning for three days before charging him, which indicates that they doubted Ramos' identification. Manning cites no

17

factual support for this contention, beyond a statement of fact that gives his charging date of May 15, 2010, Doc. 67 ¶ 79, and the Court need not credit unsupported arguments. *See United States v. Thornton*, 642 F.3d 599, 606 (7th Cir. 2011) ("Undeveloped and unsupported arguments may be deemed waived."). Manning further argues that the negative identification of Manning in a line-up by another victim of a similar group robbery is proof that Manning should not have been charged. Again, Manning points to no facts that would tie this other line-up to the charging decision on the Ramos robbery. Manning further argues that malice can be inferred here from the absence of probable cause and that Defendants knew that Ramos never saw the third offender and that Manning was negatively identified for the other robbery. However, for all the reasons already discussed, these arguments fail. Manning has not met his burden to put forward affirmative facts on his malicious prosecution claim. Therefore, summary judgment is granted for Defendants on Count IV.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment [65] is granted. Judgment is entered for Defendants and this case is terminated.

Dated: March 31, 2015

SARA L. ELLIS
United States District Judge